UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **LAUREN BERTRAM, ET AL** | **CASE NO. 2:19-CV-01478 LEAD** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **PROGRESSIVE SOUTHEASTERN INSURANCE CO ET AL** | **MAGISTRATE JUDGE KAY** |

### MEMORANDUM RULING

Before the Court is a "Motion for Summary Judgment" (Doc. 154) filed by Defendant, Convermat Corporation ("Convermat"), who moves to dismiss all claims asserted by Plaintiffs.

### FACTUAL STATEMENT

The lawsuit involves a vehicle accident that occurred on July 16, 2019. Defendant, Justin Chong was operating a Freightline tractor towing a trailer loaded with paper rolls. The tractor experienced a blow-out of the front driver's side tire causing Chong to lose control of the tractor, which crossed the solid yellow line and struck a vehicle driven by Stephen Bertram in the oncoming lane. Mr. Bertram did not survive the accident.

Plaintiffs allege that the unsecured paper rolls shifted during transport and caused or contributed to the tractor-trailer collision.

Plaintiffs have named Convermat as one of several Defendants. Plaintiffs allege that Convermat was negligent in hiring Mallory International, LLC ("Mallory") to provide

freight-forwarding services and brokerage services.[1] Plaintiffs have consented to the dismissal of this claim. Plaintiffs allege that Mallory is the agent of Convermat, and thus Convermat is vicariously liable for the actions or inactions of Mallory.[2] Convermat, contracts with Mallory to warehouse and load its paper rolls for transportation from Mallory's facility. Mallory is a licensed freight-forwarded/broker.[3]

Defendant, Blue Grace Logistics, LLC (Blue Grace) is a licensed freight broker and Defendant, Empire National, Inc. ("Empire") was at all relevant times a licensed motor carrier.[4] Justin Chong at all relevant times was a licensed commercial vehicle operator.[5]

Convermat did not receive any instructions regarding cargo securement for the paper rolls from Blue Grace or from any other third-party logistics provider.[6] The Warehousing Agreement between Convermat (identified therein as "Depositor") and Mallory (identified therein as "Warehouseman") includes the following relevant provision:

> It is hereby agreed and understood that WAREHOUSEMAN is entering into this Agreement as an independent contractor and that all of WAREHOUSEMAN'S personnel engaged in work to be done under the terms of this Agreement are to be considered as employees of WAREHOUSEMAN and under no circumstances shall they be construed or considered to be employees of DEPOSITOR. WAREHOUSEMAN shall supervise the performance of its own employees in providing services for DEPOSITOR and shall have control over the manner and means by which its services are performed, subject to the terms of this Agreement as well as any written and mutually agreed upon amendments thereto. Nothing in this Agreement will be interpreted as creating a relationship of principal and agent, partnership or joint venture between the parties. Neither DEPOSITOR nor WAREHOUSEMAN will represent in any manner to any third party that

---

[1] Doc. 88, ¶ 41.
[2] *Id.*
[3] Defendant's exhibit 4, Tom Kaden deposition, pp. 28-29;187.
[4] Defendant's exhibit 6, Sergey Korolchuk deposition, pp. 26-27.
[5] Defendant's exhibit 2, Justin Chong deposition, p. 26.
[6] Defendant's exhibit 1, Sam Moon deposition, p. 76.

>WAREHOUSEMAN is an agent of, or affiliated with, DEPOSITOR in any capacity other than as an independent contractor, and nothing in this Agreement shall be construed to be inconsistent with such status.[7]

Convermat did not train Mallory's employees on how to perform the warehousing operations provided by Mallory pursuant to the Warehousing Agreement.[8]

Convermat retained Blue Grace as a broker to arrange for the transport of paper rolls from Mallory's warehouse in Texas to Convermat's customer in North Carolina.[9] Blue Grace, as the broker, was responsible for retaining a qualified motor carrier, and it retained Empire to serve as the motor carrier for the transport in question.[10] At the time Convermat entered into the Warehousing Agreement with Mallory, the proposed scope of work estimated that Mallory would handle the loading and unloading of approximately 200 trailers per month on behalf of Convermat.[11]

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

---

[7] Defendant's exhibit 3, pp. 6-7.
[8] Defendant's exhibit 3, pp. 185, 187, 196.
[9] Defendant's exhibit 4, p. 76.
[10] Defendant's exhibit 8, pp. 98-100.
[11] Defendant's exhibit 4, p. 47.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## LAW AND ANALYSIS

Plaintiffs allege that Mallory was grossly negligent in breaching its duty to properly secure the load of paper inside the trailer attached to the tractor operated by Chong.[12] The securement of the load was investigated by Louisiana State Police Trooper Timothy Guinn,

---

[12] Plaintiffs' Third Amended Complaint, ¶ 42.

a Commercial Vehicle Enforcement officer.[13] Specifically, Trooper Guinn, found that the subject load violated 49 CFR § 393.122(B), the Federal Motor Carrier Safety Regulation specific to the securement of paper rolls transported with eyes vertical in a sided vehicle.[14] Trooper Guinn determined that no securement devices were used on the paper rolls.[15]

Plaintiffs assert that Mallory employees were solely responsible for loading the paper rolls at issue into the trailer owned and operated by Defendant Empire.[16] Plaintiffs argue that Mallory was acting on behalf of Convermat as an agent when it loaded the trailer with paper rolls.[17]

Plaintiffs maintain that because Mallory was Convermat's agent, Convermat is vicariously liable for the acts of its agent.

Under Louisiana law, the doctrine of vicarious liability, or respondeat superior, is expressed in Louisiana Civil Code art. 2320, which states that "[m]asters and employers are answerable for the damage occasioned by servants and overseers, in the exercise of the functions in which they are employed." *Urbeso v. Bryan*, 583 So. 2d 114, 116–18 (La. Ct. App. 1991). Under LSA-C.C. art. 2985, a principal may be liable for its agent's actions; however, a principal is not liable for any actions by an independent contractor. *Urbeso*, 583 So.2d at 116; citing *Williams v. Gervais F. Favrot Company*, 499 So.2d 623 (La.App. 4th Cir.1986). In determining whether vicarious liability will attach under Louisiana law,

---

[13] Plaintiffs' P-5, Trooper Timothy Guinn, p. 8.
[14] *Id.* p. 25:12, 14, 15.
[15] *Id.* p. 25:20.
[16] *Id.*
[17] *Id.* ¶ 41.

it must be determined whether an agency (*i.e.* master-servant or employer-employee) relationship or an independent contractor relationship exists. Id.

In general, "[t]he right of control and supervision, selection and engagement, payment of wages, and the power of dismissal determines whether an 'employee' status exists." Id. at 116-17, citing *Ermert v. Hartford Insurance Co.*, 559 So.2d 467 (La.1990). An employee/agent has a close relationship and is subject to control by the employer or principal. However, agency is never presumed. Instead, "it must be clearly established." *Id*.

In Louisiana, "an agency relationship is created by either the express appointment of a mandatory under Civil Code Article 2985, or by some implied appointment which traces to apparent authority." *Administrators of Tulane Educ. Fund v. Biomeasure, Inc.*, 687 F. Supp. 2d 620, 629–30 (E.D. La. 2009). "Implied or apparent agency exists if the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal." *Urbeso*, 583 So.2d at 116. "Apparent agency arises when the principal has acted so as to give an innocent third party a reasonable belief that the agent had the authority to act for the principal … and the third party reasonably relies on the manifested authority of the agent." *Barrilleaux v. Franklin Found. Hosp.*, 96-0343 (La. App. 1 Cir. 11/8/96), 683 So. 2d 348, 354. Liability of a principal for the acts of an agent does not exist unless the agent is a servant who "has a close economic relationship and is subject to control by the principal" *Id*. (Emphasis supplied.) "A servant offers personal services for a price and must submit to the control of his physical conduct and time." *Id*.

Furthermore, Louisiana courts have held that "the mere existence of an agency relationship does not impose vicarious liability on the principal for the physical torts of a non-servant agent." *Miller v. Universal Underwriters Insurance Co.*, 308 So.2d 842 (La. App. 2 Cir. 1975). "The determination of whether a party may be held vicariously liable for the torts of another depends on whether the tortfeasor is characterized as a servant." *Wetstone v. Dixon*, 616 So.2d 764 (La. App. 1 Cir. 1993). A master or employer is liable for the tortious conduct of a servant or employee which is within the scope of authority or employment, but a principal is not liable for the physical torts of a non-servant agent. *Price v. North*, 21-0236 (La. App. 1 Cir. 10/18/21), 331 So.3d 959, 970 "A servant is defined as one employed to perform services in the affairs of another and who is subject to the other's control or right to control with respect to the physical conduct in the performance of the services." *Id*. A servant may possess the qualities of an agent, but all agents do not qualify as servants, and the master-servant relationship cannot be equated with the principal-agent relationship. *Aupied v. Joudeh*, 96-202 (La. App. 5 Cir. 4/9/97), 694 So.2d 1012, 1016.

Converse to an agency relationship, an independent contractor relationship exists when the following can be established according to these factors:

1. There is a valid contract between the parties;

2. The work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;

3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;

4. There is a specific price for the overall undertaking; and

5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.38

"The most important test involves the employer's control over the work." It is not whether the principal/employer exercises control or supervision, but whether the right to exercise control exists. *Id.* citing *Tardo v. New Orleans Public Service Inc.*, 353 So.2d 409 (La.App. 4th Cir.1977).

Convermat asserts that it is not a licensed motor carrier, freight-forwarder, or broker, and it relies on third-party logistic providers to select qualified motor carriers to haul paper rolls to its customers. Convermat asserts that Mallory was responsible for unloading, storing, and subsequently re-loading the paper rolls onto the trailer operated by Chong for delivery to Convermat's customer in North Carolina.

Convermat argues that the Warehousing Agreement between Convermat and Mallory establishes that Mallory is an independent contractor as opposed to a principal/agency relationship. Convermat relies on the following provision contained in the Warehousing Agreement:

ARTICLE XVI. INDEPENDENT CONTRACTOR

It is hereby agreed and understood that [Mallory] is entering into this Agreement as an independent contractor and that all of [Mallory's] personnel engaged in work to be done under the terms of this Agreement are to be considered as employees of [Mallory] and under no circumstances shall they be construed or considered to be employees of [Convermat]. [Mallory] shall supervise the performance of its own employees in providing services for [Convermat] and shall have control over the manner and means by which its services are performed, subject to the terms of this Agreement as well as any written and mutually agreed upon amendments thereto. Nothing in this

> Agreement will be interpreted as creating any relationship of principal and agent, partnership or joint venture between the parties. Neither [Convermat] nor [Mallory] will represent in any manner to any third party that [Mallory] is an agent of, or affiliated with, [Convermat] in any capacity other than as an independent contractor, and nothing in this Agreement shall be construed to be inconsistent with such status.[18]

The Warehousing Agreement also provided that Mallory would furnish sufficient personnel, equipment, and other accessories necessary to perform "efficiently and with safety" the services requested by Convermat, including receiving, unloading, reloading, storage, trailer inspections, and warehouse storage of products.[19] Convermat also asserts that the Warehousing Agreement requires that Mallory "comply with all laws, ordinances, rules and regulations of Federal, State, municipal and other governmental authorities and the like in connection with the safeguarding, receiving, storing and handling of goods.[20] Thus, Convermat posits that Mallory was an independent contractor because Mallory maintained the right and obligation to control the manner and means by which all services to Convermat were to be performed by Mallory's employees.

To buttress its position, Convermat provides the deposition testimony of Tom Kaden, Mallory's corporate representative, who acknowledged that Convermat did not control the work performed by Mallory at its warehouse, provide training to any of the Mallory employees, instruct Mallory's employees on the manner in which trailers were loaded, or otherwise dictate who Mallory would hire.[21]

---

[18] Defendant's exhibit 3, pp. 6-7.
[19] *Id.* p. 1.
[20] *Id.* p. 7.
[21] Defendant's exhibit 4, pp. 185, 187, 196.

Convermat argues that the Warehousing Agreement expressly states that the relationship between Convermat and Mallory is that of an independent contractor. Convermat further argues that Plaintiffs cannot establish through evidence that either apparent or implied authority existed between these parties.

Plaintiffs maintain that there are genuine issues of material fact regarding (1) Mallory's status as Convermat's agent of independent contractor and (2) that Convermat is liable because it retained control over load securement, and (3) approved Mallory's unsafe work practice of loading paper rolls without the required load securement.

Plaintiffs assert that Convermat knew or should have known of the law regarding load securement. Specifically, Plaintiffs refer to the Federal Motor Carrier Safety Regulation, part 393,[22] which states, in pertinent part, that "[c]argo must be contained, immobilized or secure in accordance with this subpart to prevent shifting upon or within the vehicle to such an extent that the vehicle's stability or maneuverability is adversely affected."[23]

The minimum requirements of cargo securement (load securement) applicable to jumbo paper rolls are covered in 49 CFR §393.122. The applicable provisions are provided below:

> Each roll must be prevented from forward movement by contact with vehicle structure, other cargo, blocking or tiedowns. (2) each roll must be prevented from rearward movement by contact with other cargo, blocking, friction mats or tiedowns.
>
> § 393.122 What are the rules for securing paper rolls?

---

[22] 49 CFR § 393.100.
[23] *Id.*

(a) Applicability. The rules in this section apply to shipments of paper rolls which, individually or together, weigh 2268 kg (5000 lb) or more. Shipments of paper rolls that weigh less than 2268 kg (5000 lb), and paper rolls that are unitized on a pallet, may either be secured in accordance with the rules in this section or the requirements of §§ 393.100 through 393.114.

(b) *Securement of paper rolls transported with eyes vertical in a sided vehicle.*

(1) Paper rolls must be placed tightly against the walls of the vehicle, other paper rolls, or other cargo, to prevent movement during transit.

(2) If there are not enough paper rolls in the shipment to reach the walls of the vehicle, lateral movement must be prevented by filling the void, blocking, bracing, tiedowns or friction mats. The paper rolls may also be banded together.

(3) When any void behind a group of paper rolls, including that at the rear of the vehicle, exceeds the diameter of the paper rolls, rearward movement must be prevented by friction mats, blocking, bracing, tiedowns, or banding to other rolls.

(i) If a paper roll is not prevented from tipping or falling sideways or rearwards by vehicle structure or other cargo, and its width is more than 2 times its diameter, it must be prevented from tipping or falling by banding it to other rolls, bracing, or tiedowns.

(ii) If the forwardmost roll(s) in a group of paper rolls has a width greater than 1.75 times its diameter and it is not prevented from tipping or falling forwards by vehicle structure or other cargo, then it must be prevented from tipping or falling forwards by banding it to other rolls, bracing, or tiedowns.

(iii) If the forwardmost roll(s) in a group of paper rolls has a width equal to or less than 1.75 times its diameter, and it is restrained against forward movement by friction mat(s) alone, then banding, bracing, or tiedowns are not required to prevent tipping or falling forwards.

(iv) If a paper roll or the forwardmost roll in a group of paper rolls has a width greater than 1.25 times its diameter, and it is not prevented from tipping or falling forwards by vehicle structure or other cargo, and it

>> is not restrained against forward movement by friction mat(s) alone, then it must be prevented from tipping or falling by banding it to other rolls, bracing or tiedowns.
>
> (5) If paper rolls are banded together, the rolls must be placed tightly against each other to form a stable group. The bands must be applied tightly, and must be secured so that they cannot fall off the rolls or to the deck.
>
> (6) A friction mat used to provide the principal securement for a paper roll must protrude from beneath the roll in the direction in which it is providing that securement.

Plaintiffs also submit that the Warehousing Agreement, which expressly states that Convermat maintained the right to control the manner in which its products are shipped. Plaintiffs rely on the following pertinent provisions:

> **ARTICLE IX. DELIVERY REQUIREMENTS**
>
> (A) No goods shall be delivered or transferred except upon receipt by [MALLORY] of complete instructions properly signed by [CONVERMAT].
> ….
>
> **ARTICLE X. EXTRA AND SPECIAL SERVICES**
>
> (A) Warehouse labor required for services other than ordinary handling and storage must be authorized by [CONVERMAT] in advance. Rates and charges will be provided for herein or as mutually agreed by the parties hereto (see Schedule "A").
> …
>
> (C) Dunnage, bracing, package materials or other special supplies such as straps, mats, etc. used in shipping are chargeable to [CONVERMAT] and may be provided at a mutually agreed upon charge (see Schedule "A").
> ….

### ARTICLE XVII. COMPLIANCE WITH LAWS, ORDINANCES, RULES AND REGULATIONS

(A) [MALLORY] shall comply with all laws, ordinances, rules and regulations of Federal, State, municipal and other governmental authorities and the like in connection with the safeguarding, receiving, storing and handling of goods.

(B) **[CONVERMAT] shall be responsible for advising [MALLORY] of all laws, ordinances, rules and regulations of Federal, State, municipal and other governmental authorities and the like relating specifically to the safeguarding, receiving, storing and handling of [CONVERMAT'S] products.**

### ARTICLE XXIX. ACCURATE INFORMATION

**[CONVERMAT] will provide [MALLORY] with information concerning the goods covered by this Agreement which is accurate, complete and sufficient to allow [MALLORY] to comply with all laws and regulations concerning the storage, handling and transporting of those goods**…[24]

Plaintiffs argue that even though Mallory provided the personnel, equipment, and facility to perform the services requested by Convermat, Mallory looked to Convermat for specific instructions regarding the shipping of its products. Thus, Convermat was contractually responsible for instructing Mallory on any delivery requirements for authorizing labor and devices for securement and advising Mallory on rules/regulations specific to transporting paper rolls.

In addition, Plaintiffs submit Mallory's corporate representative deposition, which they argue creates issues of fact regarding (1) Mallory's agency status and (2) Convermat's right to control load securement. The Mallory Corporate representative, Tom Kaden,

---

[24] Defendant's exhibit 3, Warehousing Agreement (emphasis added) Doc. 154-5.

testified that Convermat is the shipper and Mallory acts "as an agent on behalf of the client."[25] He further explained, "In general, we don't act as a shipper, so we act as an agent for the shipper. The shipper normally is our customer."[26]

Plaintiffs submit Mr. Kaden's testimony explaining language contained in the bill of lading, ("Mallory Alexander International, agents for Convermat.")[27] When asked to explain, Mr. Kaden testified:

> Q. "Okay. So he's signing on behalf of Convermat. That's the language that states he's the agent; is that right?
>
> A. Yes.[28]

Mr. Kaden also testified that Convermat was responsible for instructing Mallory on load securement. In other words, all instructions for load securement were received from and/or given by Convermat, and Mallory relied upon its client (Convermat) to advise it of any special loading requirement.[29] Mr. Kaden testified that Convermat gave no instructions regarding the securement for the subject load.[30]

To create a genuine issue of material fact, Plaintiffs also submit the Convermat corporate deposition testimony of Samuel Moon. Mr. Moon testified Convermat was responsible for informing Mallory as to any special instructions, including rules, ordinances, laws and regulations, that concerned load requirements of the subject paper rolls, but Convermat failed to do so.[31]

---

[25] Plaintiffs' exhibit P-1, p. 55:4-5.
[26] *Id.* p. 55:18-20.
[27] *Id.* pp. 111,115.
[28] *Id.*
[29] *Id.* pp. 64, 168.
[30] *Id.* p. 162.
[31] Plaintiffs' exhibit P-2, pp. 33, 55, 60, 62.

Convermat maintains that the driver and/or the motor carrier are responsible for ensuring the load is properly secured. However, Mr. Moon testified that he was not certain if Convermat communicated to Mallory or Blue Grace that the driver had the authority to incur additional services as described in the Warehousing Agreement.[32] The driver, Mr. Chong, testified that he was instructed to stay in his vehicle and was not allowed to enter the loading dock due to safety concerns.[33]

Plaintiffs submit the report of Randy Phares, an expert in the field of packaging, distribution, and shipping, wherein Mr. Phares opined that Convermat was contractually obligated to notify Mallory of the applicable load securement rules.[34]

Louisiana courts have explained that the "existence of an independent contractor agreement is not necessarily dispositive," and that courts must "inquire as to the real nature of the relationship and the degree of control exercised. *Henderson v. Atmos Energy*, 509 F. Supp. 3d 625, 634 (E.D. La. 2020), *aff'd sub nom. Henderson v. Atmos Energy Corp.*, 2022 WL 3657191 (5th Cir. Aug. 25, 2022) citing *Arroyo v. E. Jefferson Gen. Hosp.*, 956 So. 2d 661, 664 (La. App. 5 Cir. 2007).

The Court finds that Plaintiffs have submitted summary judgment evidence to create an issue of material fact for trial as to whether or not a principal/agency relationship existed between Convermat and Mallory. The Court further finds that even if there is an independent contractor relationship between Convermat and Mallory, there is a genuine issue of material fact for trial as to whether or not Convermat is liable for failing to give

---

[32] *Id.* p. 70.
[33] Plaintiffs' exhibit P-3, Chong deposition, pp. 61-80.
[34] Plaintiffs' exhibit P-4, pp. 7-8.

Mallory proper instructions regarding the securement requirements for transportation of the paper rolls, thus authorizing an unsafe work practice. See *Echeerry v. Jazz Casino Co., LLC,* 988 F.3d 221, 233 (5th Cir. 2021) (court finds that the evidence was sufficient for a reasonable jury to conclude that the principal authorized the unsafe work practices of its contractor, when it authorized the contractor's movement of a manlift on the Casino's premises without a flagman. The casino was found liable for the tortious acts of its contractor).

## CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment (Doc. 154) filed by Defendant, Convermat Corporation is **DENIED.**

**THUS DONE AND SIGNED** in Chambers on this 25th day of January, 2023.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**